Case number 18-4183, Keshia Ma v. Bon Appetit Management Company. Oral argument not to exceed 15 minutes per side. J. Michael Murray for the appellant. You may proceed. Good morning. Good morning, Your Honor. May it please the Court. My name is Michael Murray and I do represent Professor Keshia Ma and her husband in this personal injury action against the defendant, Apple Lee Bon Appetit. I would like to reserve three minutes of my time for rebuttal. Very well. Your Honor, as you know, it was on November 6, 2015, Professor Ma was dining with her students at Oberlin College when a heavy, movable partition that was unsecured to its track, a movable wall, fell on her head and she was severely injured. She suffered permanent brain damage and, as a result, it ended the teaching career that she loved so much. The dining hall, as we know, was operated by Bon Appetit under a management agreement with Oberlin College that had been in effect for many years. We respectfully submit that there was ample evidence in the record which, when viewed in a light most favorable to the plaintiffs, would permit a jury to find that Bon Appetit's occupancy, control, and operation and management of the dining hall was sufficient to conclude that it owed a duty of care to the patrons of the dining hall, including Professor Ma. Right. Bon Appetit did not have a lease for the premises. That is correct, Your Honor. So it's not premises liability. You say the duty arises from the contract? Well, they did occupy the premises, Your Honor. Where does the duty come from if it's not premise liability? If it's not from a lease, where is the duty? It is premises liability because they had sufficient control and occupancy of the premises. As if they were a lessee of the premises? The point is a jury could find that their control and occupancy of the premises and the duties under the contract that were imposed upon them to take care of the premises that they occupied and controlled. What is the contractual language to which you refer that establishes that duty? Because just because they had an operating contract to provide some services wouldn't necessarily and automatically extend, would it? Couldn't you have a company that comes in to provide some services within a premises and the duty could be cabined to the lessor? So what is the language you're relying on to establish this duty? There are a number of provisions. Number one, it provided that it would operate and manage the dining hall, all four dining halls, that's important. It granted them the exclusive right to perform the food service operation on the premises. It gave them the keys. They had the right to open and the duty to open the dining hall in the morning and admit the people, and they had the duty to close the dining hall at night and to exclude everyone who was no longer permitted to be there. There's language that says they had to, quote, take reasonable and proper care of the premises and equipment under its custody and control. In several places they refer to their occupancy of the premises. They weren't exclusively the occupant. The university did retain its right to enter the premises as well. I don't dispute that, but that doesn't mean that Bon Appetit didn't occupy the premises from morning to night. They had to obtain all the food service licenses. There was a provision in the contract that specifically said they were responsible for housekeeping and sanitation in food preparation, customer traffic areas, storage and serving areas. They were obligated to- Isn't that different than maintaining the structure of the dining hall? And, I mean, having a duty to maintain the equipment in the dining hall is one thing, but these sliding partitions are part of the structure. And we're in the contract. Are they responsible for the physical structure of the dining hall? Because the testimony was undisputed by all their management personnel that if they observed a problem with any of those structural areas, they had a duty to immediately report it to Oberlin. They did, did they not? Yes, yes, because they had a duty to do so. So they satisfied their duty, did they not? Well, no, no, Your Honor. If they reported it and they were not obligated, I don't think they were even empowered to fix the structure. There were a number of things that they had the opportunity to do that would have prevented this accident. Number one, they could have asked or directed the facilities department to move the object into one of the six storage closets, which was designed for that, or into two of the- But once they reported that issue to Oberlin, didn't that become the responsibility of Oberlin to do whatever needed to be done to abate whatever the problem was? That was the whole reason to have the reporting obligation. Sure, from what you read to me, if there was a puddle of water or an overflowing toilet or something like that, that was clearly their obligation. But once they reported this, didn't it become Oberlin's problem? No, Your Honor. Every single management employee of Bon Appetit testified that they had a duty every day. That's a legal conclusion. That's an improper question to ask an employee, did you have a legal duty, and I don't- Well, I- That's not even admissible evidence, I mean, really. Well, they testified that this is what they did every day. Okay, that's different than their legal conclusion. I agree that I have a legal duty to do that. No, no, I misspoke. All of them testified that as part of their job duties they would walk through the dining hall every single day, inspect it, and if they noticed something that was dangerous or that was a safety hazard, they would immediately take action to either correct it themselves if they had the power to do so, or they would immediately report it to Oberlin College through a work order directing Oberlin College to fix it. Now, they testified that they saw this partition leaned up against the wall in this private dining area every day for about three weeks. They testified that they could have directed the Oberlin facilities to remove it and place it in the closet in the storeroom, but they did not do that. They testified that they had the power and duty to put up warning signs when a warning sign was needed. They could have put up a... And they had access to warning signs, and they could have put up a warning sign that says, Do not touch this. Don't stand it back upright. And then finally, their marketing manager and dietician actually saw the partition propped back up, unanchored, to the track while the Professor Ma and her students were dining at the table. And he sat there for five or ten minutes, and he could easily have appreciated the danger and immediately gone into that room and pointed out that that movable wall was dangerously propped up, unanchored and unsecured. He could have done it, but did he have a duty to do it? We submit that he did because they had a sufficient control of the premises throughout their... Because of their contract and their duties and their management responsibilities to operate the dining hall, that yes, they had a premises liability situation. It isn't as if you can't have more than one party responsible for the premises. You can have more than one. And Oberlin College didn't open up the dining room every day, and Oberlin College didn't inspect the dining room every day. It was left to Bon Appetit to open it up and to inspect the dining room. And if they saw something, they were the ones who had the duty to report it to Oberlin College because if they didn't report it, the danger would persist. There's something in the record that the day of the incident, this partition was moved again to a new position that was even more dangerous than the other position, and you don't have any allegation that Bon Appetit moved it, do you? All of their testimony was they didn't know who moved it. We obviously weren't able to find out, but no, Bon Appetit testified that there were... So was there any evidence that they knew it had been moved? Yes, yes. Their marketing manager and dietician, management personnel, was seated in the dining room facing that partition for 5 to 10 minutes, and he saw it fall on Professor Ma. And he testified that, yes, he saw that it had been back upright and still was not anchored to its track. So he had the final opportunity to prevent this terrible injury when he saw that wall precariously positioned in such a way that it could easily totter over as it did, and he saw the fact that a student sitting on the other side of the wall leaned up against it with his chair, and it immediately toppled over and fell on Professor Ma's head. So, yes, the last person who had an opportunity to prevent this terrible injury was the managing marketing director and dietician of Bon Appetit who saw the whole thing happened and did nothing to warn anyone or to take action because of the dangerous situation that he observed about this wall that fell on her head. The issue generally, as the appellee says, of whether you can be liable for premises liability turns in part on whether you had the right to admit or exclude patrons. They say, well, the college determined who would be allowed to enter the dining hall in terms of being served. But that isn't the whole story. The evidence is clear that the only keys to open the dining hall, other than Oberlin, which didn't open the dining hall, was Bon Appetit. And at 5.30 in the morning, they would come in, they'd open up the dining hall, they would inspect the dining hall. Your argument there goes to really who had control of the premises. Yes. And so when you're talking about control, what factors, other than the ability to admit or exclude, should the court consider in determining this control factor using, if you would, the Freiberger test case? All the bundle of rights and obligations that Bon Appetit had, that I've cataloged, that arise under their management agreement to operate and manage this business. But you have to look at those, don't you, also, in paramateria to the position and the control of Oberlin and the possessory interest of Oberlin. Don't you have to consider those and weigh them? You can certainly take those into account, but that's what the jury is. You see, it's a question for the jury. That's the point here. This was summary judgment. The facts that the appellee wants to rely upon, let them argue it to the jury, and we'll argue our facts. But summary judgment was inappropriate here because if you view the evidence in the light most favorable to the plaintiffs, the case needs to go to the jury. We're not saying that the jury is automatically going to rule in our favor. We don't know, but we're entitled to have a jury decide it, not the district court as a matter of law. So there's a genuine issue of material fact as to where control resided in this situation. As to whether Bon Appetit had sufficient control and a bundle of rights that put them in occupancy of the premises and operating this business that would permit a jury to find that they had a duty of care to the patrons, including Professor Monk. The jury doesn't find duty, do they? Duty is an issue of law. Well, except that the judge would instruct the jury, in order for the plaintiff to prove that there was a duty, the plaintiff has to prove X, Y, and Z. And if there's a dispute of fact as to what X, Y, and Z are, then the jury would decide the dispute of fact as to whether Oberlin had sufficient control. Okay, so what genuine issues of material fact are there that the jury would resolve on the issue of control? All of them. The bundle of rights, their occupancy, their duties, the fact they supervise. Duties is an issue of law. I mean, bundle of rights seems like that's an issue of law, too, that you can look at the contract. I don't think you have a jury do that. I mean, what factual issues would you have the jury resolve? Well, for example, whether, in fact, the evidence would permit the conclusion that Bon Appetit had the right to admit or exclude, which is one of the issues that can be taken into account in determining whether a duty is owed. So we say there is plenty of evidence that would permit a jury to find that Bon Appetit had the right to admit and exclude, and they claim the opposite. The jury needs to decide between those competing arguments and facts which version to accept. Thank you, Your Honor. Any further questions? You'll have your three minutes rebuttal. Thank you, Your Honor. Good morning. Good morning. From the Payne case on the issue of duty, Your Honor, I don't normally like to read quotations. You're Mr. Eblen? Yes, Your Honor. The existence of a duty is a question of law, even if resolving it requires the court to consider facts and evidence. That's from 1085 of the Payne case decided under Ohio law in 2017. So the court is correct. Duty is always a question of law for the court, even if you have to examine some underlying facts and evidence. And what the appellant asked the court to do in this case would run contrary to all precedent of this court and in the state of Ohio, which would be to take a contractor and impose affirmative duties that only exist in special relationships, like a premise liability scenario, and even though the contract specifically prohibited Bon Appetit as a contractor from remedying this fixture that had a problem. I want to stop you there because I think this whole word, remedying, has a lot of permutations, if you will. But I want to ask you, putting aside the legal standard, and I agree with you regarding duty, was, from a factual standpoint, was Bon Appetit in the best position to remedy the situation by keeping the aperture from falling on the head of the patron? Were they in the best position to avoid the accident under the facts of this case? No, and the reason? They don't have the power to fix it. The remedy for it is to take a fixture that is owned by the college on their premises and repair it, and from a policy perspective, and that's exactly why courts draw lines on when in tort law. This isn't a case where somebody acted unreasonably and their conduct caused harm. They're asking this court to impose an affirmative duty that only exists in special relationships. Well, I thought this was a partition that ran along a track that was unhinged. Could this not have been moved to another area to mitigate the harm, and could Bon Appetit have done that to avoid the accident? Not under the terms of the contract, no. The terms of the contract, this being a fixture, that are specifically delineated as to who's responsible for it. I suppose anybody could have moved it, but the power to do that under the contract is delegated. What about the obligation? I think both. I think in this case it's one and the same, and particularly when you view it through the lens of Ohio law of premise liability and when you're going to impose an affirmative duty like this, you look to two things. Do you have the legal power, the control over the premises to do that? And the answer to that is no, and the starting point for that analysis, as this court found in Washburn and all the state substantive law finds, is does the lease delegate to, in this case, not even the lessee, but a contractor the power to do that? The answer is no. Even if the answer to that were yes, is there any record evidence to show that they substantially exercised that power? And the answer to that is clearly no, and they really haven't even put forth any evidence at the Rule 56 standard to try and meet that obligation. We've got the terms of the lease. We've got the Bon Appetit employees who said, once we report this, we can't do anything with this. And finally, and it's not been addressed, but no depositions were taken of the college, and there is an unrefuted affidavit from the dean of students who had the supervisory power to administer this contract, who said Bon Appetit, as our contractor, has never had the power to admit or deny people into the cafeteria and has never had the power or authority to take steps to remedy something like a real estate fixture on our property. Okay, so a question hypothetically. Let's assume that, and you may dispute whether or not this is in the record, but assume that Bon Appetit observes the danger, reports it to Oberlin, and Oberlin has either not had time to react or hasn't reacted. What, under the contract and the facts, should Bon Appetit do at that point? Because you said they didn't have the duty to remedy this. So what should happen? Well, ideally you would hope that Oberlin would repair it and repair it more. Ideally, but they didn't this time, in my hypothetical. Correct. So what does Bon Appetit do? What are they required to do under tort law? Nothing more. Nothing more under the facts and circumstances of this case, and that is one of those areas of law where public policy intervenes and says there is a line at which we're going to draw a boundary between your obligation to affirmatively act to protect others. That's an exception to the general rule that there's no affirmative duty to act to protect others. There is an affirmative duty not to commit malfeasance, to act negligently and harm someone else, but it's only in special relationships where tort law imposes an obligation to act or protect others. And so under the facts and circumstances of this case in Ohio law, in this Court's opinion interpreting Ohio law under Washburn, that's it. That's where that public policy line is drawn. Now, as some of the questions implied, it might be a very different case had the plaintiffs come forward with evidence to show that Bon Appetit and its employees committed an affirmative act that led to the damages and injury here. Had somebody decided, you know, we're just going to, in order to help the landlord with getting this repaired, we're going to set this right here so that it's right there ready for them and we've put it in a precarious situation and we created a risk. That's a different case. The allegation that it was moved that morning of the incident, that it had been against a wall, then all of a sudden it had been improperly installed, isn't that? The allegation is, yes, it sat on an exterior wall for a period of weeks. Nobody had repaired it. And some unknown individual moved it. Okay. I assume that they took depositions of the Bon Appetit employees and none of them did it. Is that right? Correct. So if they didn't do it, by process of elimination, I think Oberlin must have done it, right? Agreed. And that makes logical sense, too, because they're the ones who are empowered and, in fact, required under premise liability law to maintain a safe environment for invitees on their premises. What about the argument that your employee was sitting there having lunch with the plaintiff and either saw it or could have seen how it was How do you respond to that? The response is that doesn't in any way speak to premise liability law and the imposition of duty. The imposition of a duty under a premise liability standard is, do you have control? One. Two, did you substantially exercise that control? Otherwise, there's no duty. Again, and it starts with what the district court analyzed very thoroughly in the opinion. The starting point is, do we have a scenario where there's active negligence that causes someone harm? What about the sort of the at very least you could have warned of a danger that you were aware of, even though you may not have had the authority to do anything about it? That all falls back to the same starting point on duty. In this scenario, the claim at issue is a premise liability claim. And under premise liability law, to have that affirmative obligation to maintain a safe space for invitees, the test remains the same. No matter how you argue the theory of it, the duty originates, begins, and ends with the idea of control and substantial exercise of that control. And regardless of the case theory, and I think that's also borne out in the Washburn case. The Washburn case that this court decided had various iterations of a tort negligence claim. It wasn't just a premise liability claim. They had a negligence per se and a couple of other negligence theories. But the origin of the duty still had to arise from the duty to safely maintain a premise. And the two defendants who obtained summary judgment that was affirmed by this court, this court found that neither passed the control test. So again, whether it's a failure to warn, negligence per se, whatever the tort theory in this context, the obligation to take affirmative acts to protect someone begins and ends with the control test. And from a legal standpoint, they haven't met it under the terms of the lease. There is a provision that refutes control. And on substantial exercise of that power, we would submit to the court, they haven't even offered any evidence to support substantial exercise. And in fact, all of the evidence from Oberlin, which they could have taken a 30B6 deposition, they could have deposed anyone associated with that contract, and Oberlin says, yeah, that was our responsibility. We missed on this one, but that was our responsibility. I would conclude by pointing out two distinctions between the Monin case and Freiberger, which are heavily cited by the appellants. And in those cases, the duty related to the exact instrument of harm that ended up damaging the plaintiff. So in Freiberger, it was the lake level. The Homeowners Association had control over patrolling the water and controlling the lake level. Someone dove in the water, it was shallow, there was an injury. They had control over the instrumentality of harm. The same is true of Monin, where you have a bank and some of its parent companies. The parent companies dictate safety and security to the branches. And so they had control over the instrumentality of harm. The opposite is true here, where a commercial lease to us, or a commercial contract, where we're not even a lessee, where a contractor says, you can't maintain our fixtures. And so those cases, if anything, aren't applicable, but support our position here because we have no control over the instrumentality of harm. And if there are no further questions, I would rest on the briefs and the argument today and ask the Court to affirm. Thank you very much. Thank you. All right, Mr. Murray, three minutes rebuttal. Thank you, Your Honor. Mr. Krasnovich testified questions. So if you wanted to have that panel stored in a closet or a storeroom. Who's Mr. Krasnovich? He was one of the general managers, one of the management personnel of Bon Appetit, a management person for Bon Appetit. So if you wanted to have that panel stored in a closet or a storeroom while there was fall break going on, you could have immediately put in a work order, said it's an emergency, and asked somebody from facilities to come in and move it to a safe place to store it. You could have done that, correct? Answer, yes. Question, but you didn't, did you? No. They could have had it stored in a storeroom. Exactly. And the fact of the matter is they operated a business from those premises. They got paid to operate that dining hall. They were in control of it. There were plenty of facts that would permit a jury to find that they occupied and controlled the premises. And if you take their argument to its logical conclusion, if they have no duty to any of these patrons, they don't have to do anything. There's a broken chair. Too bad. Let the guy sit on it. They say this is a fixture, that it's not a chair I don't think would be a fixture of the building. And they say, you know, the walls, the roof, the ceiling, and these partitions are attached to the building, and it's different than spilling water on the floor or a broken chair, a non-fixture related. Well, except that they say that if they don't have any control over the premises, they don't have any duty. No, they're saying they don't have premises liability. Control over the fixtures in the building. That's their argument. Okay. I understood their argument to be a little bit more extreme. But it doesn't matter because they had enough control of the premises that they observed the broken fixture, and they're the ones who reported it. Now, under their theory, they didn't have to report it. They saw this broken fixture hanging. They could have just sat there and waited until it fell on somebody and never notified Oberlin that this danger existed. They did report it, though, did they not? Yes, but their argument is they had no duty to do so. Okay, well, that's just hypothetical. I mean, we're talking about this case. Whether or not they had a duty to report, you say they did, they say they didn't, they did report it. Yes. So even if you're correct there, they satisfied that duty. So how do you win then? Because then they had other duties, other negligence that they committed. They could have put a warning sign on it. They could have moved it into a storage room. The dietician could have come up there and said, watch out, this is a dangerous thing that's about to fall on you. All three of those things, our expert said, was the standard of care in this kind of a setting. So these are all jury questions. I understand that duty ultimately is a legal question, but it depends on facts, and if the facts are in dispute. Well, the facts, I mean, I don't see a dispute of fact. They didn't put a warning sign out, so I don't see how a jury has to resolve that. And what were the other ones you say a jury has to resolve? The question of whether or not they had sufficient occupancy, control, and management of the dining room. That's a legal question, though. I mean, the fact. Well, we say that they did. There's no dispute they didn't put warning signs out. There's no dispute as to the other facts, I think. Well, they're disputing that we had any control over the dining hall, and we have facts that say we occupied the dining hall just like a lessee would. For example, you know, the tenant in possession in a business, if he sees a broken fixture, he has to call the landlord, but he still has a duty of care to his patrons. Okay. Thank you very much. Anything else? All right, any further questions? All right, thank you, Mr. Murray. Case will be submitted. You may call the next case.